[Cite as *Straley v. Morris*, 2024-Ohio-3043.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| Chester Straley, et al. | Court of Appeals No. L-23-1138 |
| Appellants | Trial Court No. CI0202101602 |
| v. | |
| Gregory Morris, et al. | **DECISION AND JUDGMENT** |
| Appellees | Decided: August 9, 2024 |

* * * * *

John Brooks Cameron and Christopher Jankowski,
for appellants.

Samuel E. Gold, for appellee.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellants Chester and Sue Straley appeal the judgment of the Lucas

County Court of Common Pleas awarding them a total of $9,000 for their claims of

battery, civil action for injury by criminal act, intentional infliction of emotional distress,

and loss of consortium. For the following reasons, the trial court's judgment is reversed.

### I. Factual Background and Procedural History

{¶ 2} On November 15, 2020, Chester Straley was shopping at a Save-A-Lot store

in Toledo, Ohio, when he encountered two women who were not wearing their masks

during the height of the Covid-19 response. Chester asked the two women to put on their masks. The women responded by yelling racial obscenities at him. The confrontation continued at the checkout line, with one of the women threatening that someone was going to "take care of [his] ass" when he left the store.

{¶ 3} As Chester exited the store and went to his car, a truck came speeding into the parking lot. The two women pointed the truck towards him. The driver of the truck, appellee Gregory Morris, approached Chester and pulled out a handgun. Morris pointed the gun at Chester's head and said that he was going to "blow your white-ass head off." Morris also said that Chester should not mess with an ex-marine recon force. He then lowered the gun and shot Chester in his left calf.

{¶ 4} Chester fled to his home where he called 911. Ultimately, he went to the emergency room to receive treatment for his gunshot wound.

{¶ 5} On March 23, 2021, Chester and Sue Straley filed a six-count complaint against Morris, Save-A-Lot, LTD., Moran Foods, LLC, and Save-A-Lot Grocery Store. The complaint raised counts of battery, civil action for injury by criminal act, and intentional infliction of emotional distress against Morris, and a count of negligence against Save-A-Lot. The complaint also sought punitive damages and compensation for loss of consortium. The Straleys later dismissed all the defendants except Morris.

{¶ 6} Morris, despite receiving service of the complaint and appearing for a deposition, never responded to the complaint. Thus, default judgment was entered against him on January 17, 2023. Morris moved to vacate the default judgment, which

2.

the trial court denied. The matter then proceeded to a damages hearing via video conference.

{¶ 7} At the damages hearing, Dr. Kenneth Davis testified on behalf of the Straleys. Davis is a clinical psychologist who began treating Chester shortly after the shooting incident and diagnosed him with post-traumatic stress disorder ("PTSD"). Davis testified that he had not seen Chester in over a year but had an upcoming appointment with him later that week. According to Davis, Chester reported that his sleep was affected, that he was nervous to go out in public, and that he was having negative thoughts about himself. Davis opined to a reasonable degree of psychological probability that Chester's PTSD diagnosis would continue through the rest of his life.

{¶ 8} On cross-examination, Davis testified regarding his notes that he took during his sessions with Chester. Many of the notes alluded to Chester's frustration with the justice system, which he viewed to be slanted along racial lines against him, and his perception that the police and the court system did not want to protect him for fear of being labeled racist because he was white and Morris was black.

{¶ 9} Chester testified next. He stated that it was very painful when he got shot, and the wound took about two months to heal. He still has residual physical effects from the shooting, in that he will feel a sharp pain in his calf and his leg will become weak. Chester testified that he can no longer walk long distances, he has a slight limp, and it is hard to walk up hills or climb steps. Mentally, he is a "wreck." He is nervous around loud noises, is afraid to go out in public alone, no longer goes to the fair, the mall, the

3.

theater, or school functions, and has night terrors so he no longer sleeps in his bed with his wife and as a result is no longer physically intimate with her.

{¶ 10} During cross-examination, Chester was asked what he said when he first walked into the Save-A-Lot. Counsel objected on the grounds that it was irrelevant to the damages hearing because liability was already established through the default judgment. The trial court overruled the objection, reasoning "Liability is not the issue, but the facts and circumstances are important to me. If I'm going to determine from what happened here something that is related to Mr. Morris's actions I need to understand the whole story. I think this is completely relevant. So I am trying to figure out the entire big picture here." Chester then denied using any racial slurs during the altercation.

{¶ 11} Chester also testified regarding a recent case where he was originally charged with a safe school assault stemming from a dispute that happened at his daughter's school where he allegedly hit someone. He claimed that he was set up by Morris's niece, then the video of the incident mysteriously disappeared, and he was forced to plead guilty to disorderly conduct.

{¶ 12} During the line of questioning, Chester became highly agitated, believing that Morris's counsel was accusing him of being a racist. The trial court interrupted the proceedings for Chester to regain his composure.

{¶ 13} Counsel then asked Chester about a prior injury in 2012, following which he reported that he had difficulty sleeping, was unable to perform household chores, and suffered from depression that prevented him from going outside. On redirect, he clarified that the symptoms occurred following a shoulder surgery. He has since fully recovered

4.

from the surgery and was not experiencing any of those symptoms at the time of the shooting incident.

{¶ 14} Sue Straley testified that the shooting dramatically changed her husband. He now is very withdrawn and no longer does fun things with her or with his friends, he rarely talks to her anymore, and they have stopped being physically intimate. She explained that she has had to reduce her hours at work so that she can be home to do more of the maintenance on the house and the car. She also testified that the shooting has changed Chester's relationship with his children. He also suffers from night terrors and is incapable of being out in public for more than 15 minutes at a time.

{¶ 15} The Straleys then rested, and Morris called his granddaughter, Kelmyia Morgan, as his first witness. The Straleys objected to Morgan's testimony on the grounds of relevance given that liability had already been established. The trial court again overruled the Straleys' objection, reasoning "If in the end it has no relevance on the issue at hand, which is damages, then I'll ignore the testimony, but I have no idea what this is related to at this time." Morgan proceeded to testify that Chester came into the store demanding that Morgan wear her mask and informing the clerk not to serve Morgan if she did not put on her mask. An argument ensued during which Morgan threatened to "beat his ass" and Chester called her a "disrespectful black n***er bit**." Morgan testified that Chester confronted her sometime after the incident and threatened that she and the other woman who was with her "will pay."

{¶ 16} Morris was the final witness to testify. Morris began testifying regarding the circumstances of the shooting when the Straleys objected on the nature of the leading

5.

questions. The trial court overruled the objection, commenting that "This is a damages hearing. I can separate. Just relax." Morris then testified that Chester verbally threatened him, used racial slurs, and spit on him before he fired at the ground near Chester's feet.

{¶ 17} At the end of the hearing, counsel requested $600,000 in compensatory damages for Chester Straley, $300,000 in compensatory damages for Sue Straley, and $500,000 in punitive damages.

{¶ 18} The trial court, on the record, reviewed the evidence. It found Dr. Davis's testimony "only marginally compelling" because he did not have Chester as a patient prior to the incident and had only limited information regarding Chester's psychological background. The court also considered whether Chester's conduct displayed during the hearing was a consequence of the shooting incident, along with the idea that Chester raised similar complaints following his shoulder injury in 2012. It then considered the "bottom line" question of who Chester was before the shot, who he was after, and how it has changed and impacted him. The court determined,

> There's no real justification for Mr. Straley's behavior at [Save A Lot]. . . .there is no real need for Mr. Straley to interject into a perceived wrong by him of the way someone else in our society was wearing their mask during COVID.
>
> The COVID situation caused people to do lots of different things that really they should have not concerned themselves with. The appropriate behavior in that situation would have been for Mr. Straley to

6.

just remove himself from the situation and go shop at another store, or come back at a later time, as opposed to confront somebody in public about the way they were wearing their masks.

If Mr. Straley had a displeasure with the way someone was acting it was his responsibility to remove himself from the situation. However, that does not change Mr. Morris's responsibility to not discharge a weapon, pull a weapon, point a weapon, or anything like that, at another individual just because he was wrong in the way he approached the situation.

I understand Mr. Morris's desire to protect his family members, and there is complete understanding of that, but nonetheless, he did fire his weapon.

So all of that being said, a $600,000 request for Mr. Straley is absurd. A $300,000 request for Mrs. Straley is absurd. And $500,000 of punitive damages is even more absurd. 1.4 million dollars for what happened here is completely out of the question.

That is just – Mr. Straley, I hope you weren't thinking that that's going to be a great big payday coming your way, because that is completely absurd.

I do feel that you are due an award of damages, because you should not have been shot in this situation. There is no justification for that. A parting of the ways after some terse words would have been about the most appropriate thing to happen here. Mr. Straley goes on his way, and then

Mr. Morris, you go on your way. But there is absolutely no reason a gun had to be fired in this situation.

So, I will award Mr. Straley $6,000.00. I will award Mrs. Straley $3,000.00. And there will not be any punitive damages. That's a total of a $9,000.00 award. I do believe that is generous in this situation.

Lots of people acting bad like here does not justify anything approaching what was requested in this – this $600,000, $300,000, and $500,000. As I indicated, completely absurd.

{¶ 19} On May 18, 2023, the trial court entered its judgment memorializing the $9,000.00 award.

## II. Assignments of Error

{¶ 20} The Straleys timely appealed the May 18, 2023 judgment, asserting three assignments of error for review:

1. The trial court erred when it considered evidence other than the Straleys' damages at the damages hearing.

2. The trial court erred when it awarded Chester Straley only $6,000.00 and Sue Straley only $3,000.00.

3. The trial court erred when it declined to award punitive damages.

## III. Analysis

{¶ 21} In their first assignment of error, the Straleys argue that the trial court erred when it considered Morris's evidence pertaining to the circumstances of the shooting. Specifically, they contend that the trial court improperly considered the issue of

8.

proximate cause during the damages hearing, even though proximate cause was established through the default judgment. In support, they cite *Walker v. Insane Clown Posse*, 2019-Ohio-5150, ¶ 31 (6th Dist.) for the proposition that it is error to consider proximate cause in a damages hearing following the entry of default judgment and that "[t]he trial court's analysis in such a damages hearing is limited to the amount of damages incurred as a result of the injury."

{¶ 22} Morris, for his part, rightly concedes that the issue of liability was resolved through the default judgment. He argues, however, that the purpose of his evidence was not to contest liability, but rather to mitigate damages. Thus, he contends that *Walker* is inapposite because proximate cause was not at issue in the damages hearing.

{¶ 23} While it is generally true that a defendant has the right to participate in a damages hearing and introduce evidence to minimize the damages, *Craft v. Craft*, 63 Ohio App.3d 499, 500 (9th Dist. 1989), the manner in which Morris seeks to mitigate his damages in this case is not appropriate. Here, the only issue was the extent to which the Straleys were harmed by Morris's conduct. Evidence of the circumstances of the shooting does not speak to this issue. Instead, the evidence attempts to limit Morris's liability by suggesting that Chester was partially responsible for the situation, which is a principle of contributory fault. *See* R.C. 2315.33 ("The court shall diminish any compensatory damages recoverable by the plaintiff by an amount that is proportionately equal to the percentage of tortious conduct of the plaintiff as determined pursuant to section 2315.34 of the Revised Code."). Contributory fault, however, is an affirmative defense that Morris did not raise through his failure to answer or otherwise defend against

9.

the complaint, resulting in the default judgment against him. *See Hawkins v. Graber*, 112 Ohio App. 509, 512 (6th Dist. 1960), citing *Knisely v. Community Traction Co.*, 125 Ohio St.3d 131, 136 (1932) ("It is well settled that contributory negligence is an affirmative defense."); R.C. 2315.34 ("If contributory fault *is asserted and established as an affirmative defense* to a tort claim . . .") (Emphasis added.). Thus, because of the default judgment, Morris is 100 percent liable for the Straleys' injuries and any attempt to reduce Morris's liability on account of Chester's own bad conduct in causing the incident is improper.

{¶ 24} Unfortunately, that is precisely what the trial court did in this case. Despite its repeated assertions that it could separate the issue of damages from the issue of causation, the record clearly indicates that the trial court based its award on Straley's conduct in causing the incident. In particular, the court gave little if any consideration to the evidence of the harm suffered by the Straleys, instead choosing to focus on the lack of justification for Chester's actions in initiating the dispute and not removing himself from the situation. Further, the court concluded that "[l]ots of people acting bad like here does not justify anything approaching what was requested." Therefore, the trial court erred when it improperly considered evidence of causation during the damages hearing.

{¶ 25} Accordingly, the Straleys' first assignment of error is well-taken.

{¶ 26} Because the trial court's judgment must be reversed and the matter remanded for proper consideration of the Straleys' damages based on the evidence they produced during the hearing, the Straleys' second and third assignments of error—

10.

pertaining to the amount of damages awarded and the denial of punitive damages, respectively—are moot.

## IV.  Conclusion

{¶ 27} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is reversed.  This matter is remanded to the trial court for determination of the Straleys' damages based on the evidence they produced at the damages hearing in accordance with this decision.  Costs of this appeal are assessed to Morris pursuant to App.R. 24.

Judgment reversed
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Gene A. Zmuda, J.                     _____
                                                            JUDGE

Myron C. Duhart, J.

Charles E. Sulek, P.J.                   _____
CONCUR.                                                JUDGE

                                                _____
                                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.